# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-1246V
UNPUBLISHED

| | |
|---|---|
| KARA COUCH,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: April 7, 2022<br><br>Special Processing Unit (SPU);<br>Ruling on Entitlement; Findings of<br>Fact; Prior Pain; Onset; Influenza<br>(Flu); Shoulder Injury Related to<br>Vaccine Administration (SIRVA). |

*John Robert Howie*, Howie Law, PC, Dallas, TX, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

On September 22, 2020, Kara Couch filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq*.[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on September 24, 2019, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find it most likely that Petitioner's shoulder injury would not be explained by her prior medical history, that she suffered the onset of shoulder pain specifically within 48 hours, and that she is otherwise entitled to compensation. Accordingly, Petitioner's Motion to Deem the SIRVA Table Elements are Satisfied (ECF No. 23) is granted.

## I. Relevant Procedural History

The petition was filed with all required medical records as well as affidavits from Petitioner and two other witnesses. The claim was quickly determined to be sufficiently complete and assigned to the SPU in October 2020.

In February 2021, Respondent provided a preliminary review of the case, asserting that the medical records suggested that the shoulder injury at issue pre-dated vaccination. Status Report (ECF No. 19). Petitioner promptly filed a response. Petitioner's Memorandum (ECF No. 20). I confirmed that the case would remain in SPU for that time. Scheduling Order (ECF No. 21).

In April 2021, Petitioner duly transmitted a demand to Respondent (*see* ECF No. 22), and additionally filed a "Motion to Deem SIRVA Table Elements Are Satisfied." Petitioner's Motion (ECF No. 20). At an April 26, 2021, status conference, the parties were informed that I would deny the motion without prejudice, since I deemed it somewhat premature. However, I also noted that from my preliminary review of the case, it appeared that the pre-vaccination records of shoulder pain were temporally remote, and thus unlikely to be fatal to that element of her Table SIRVA claim. Additionally, although Petitioner initially delayed treatment for her post-vaccination shoulder pain, there was evidence indicating onset within 48 hours. Scheduling Order (ECF No. 25).

Respondent entered into settlement discussions on October 21, 2021, but the parties reached an impasse just two weeks later. Status Reports (ECF Nos. 31-32). On December 23, 2021, Respondent filed his formal report opposing compensation based on the issues mentioned above (prior pain and onset). Rule 4(c) Report (ECF No. 33). I allowed Respondent to file a supplemental Response addressing Petitioner's earlier briefing as well as the affidavits, which were not acknowledged in his report. *See* Scheduling Order (ECF No. 34); Response (ECF No. 35). On February 10, 2022, Petitioner filed a Reply (ECF No. 36). The matter is now ripe for adjudication.

II.     **Authority**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined.

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## III. Factual Evidence

I have fully reviewed the evidence, including all medical records and affidavits. The evidence most relevant to my analysis is presented below:

- Petitioner Kara Couch was 35 years old upon receiving the subject vaccination on September 24, 2019. In the preceding three years, she periodically sought medical care, which is largely irrelevant (but for what is specifically addressed herein). *See generally* Ex. 5, 7.

- On November 12, 2017 (and hence two years prior to the relevant vaccination), Petitioner attended a primary care appointment to address "anxiety." Ex. 4 at 4. Petitioner reported pain that "seemed to shift location – sometimes it is in her shoulders, sometimes in her throat, sometimes under her ribs, sometimes in the front of her chest." *Id.* The pain was "intermittent… occur[ring] daily or… several times a week," and "seem[ed] to last most of the day when [it did] occur." *Id.* The pain had been present "for the past couple of months… since her father died suddenly of a heart attack at the age of 55." *Id.* She denied symptoms with exercise. *Id.*

- The physician's assistant ("PA") recorded an unremarkable physical exam, without specifically addressing the shoulders or the musculoskeletal system. Ex. 4 at 4. The initial assessment was "chest pain, unspecified type." *Id.* The PA and a supervising physician reviewed an EKG, deeming its results inconclusive ("reads

4

ST junction depression… we are not seeing this when we read it…"). *Id.* at 5. Petitioner was referred to cardiology "due to her family hx [history]," prescribed Celexa "for anxiety," and instructed to follow up in four to six weeks. *Id.*

- On December 1, 2017, Petitioner saw a cardiologist. Ex. 6 at 3. There is no patient questionnaire or history of present illness; the appointment reason was "chest discomfort." *Id.* The record notes that Petitioner had never smoked cigarettes, but her father had suffered from premature coronary artery disease. *Id.* at 4. On a treadmill exercise test, Petitioner walked for eleven minutes, escalating to 4.2 miles per hour at a grade of 16%, then stopped either due to fatigue or because she achieved the target heart rate. *Id.* at 8, 27. There is no physical exam, assessment, or plan. The cardiologist instructed Petitioner to follow up in three months, but there are no further records. *Id.* at 6.

- At the next medical encounter (a December 20th primary care follow-up appointment), the same PA recorded that Petitioner's chest pain, "sensation of lump in throat," and stress were improving, without starting the prescription for Celexa. Ex. 4 at 6. Petitioner opted to "monitor sx [symptoms] for now." *Id.* The PA maintained the assessment of "Chest pain, unspecified type." *Id.*

- There is no evidence that Petitioner experienced any of the above complaints, or left shoulder pain, inflammation, or dysfunction, over the next 21 months.[3]

- On Tuesday, September 24, 2019, a pharmacy employee administered the subject flu vaccine into Petitioner's left deltoid muscle. Ex. 2 at 3.[4]

- The next medical encounter is from 14 days later, on Tuesday, October 8th, when Petitioner presented for an annual gynecological examination. Ex. 8 at 8. She provided a history pertaining to the listed categories of "bowels/ bladder, gyn, sex, bc, mamm, and pap." *Id.* She "denie[d] complaints today" and requested a refill of one prescription medication. *Id.* The gynecologist examined her neck, heart, lower extremities, breasts, abdomen, and pelvis. *Id.* The encounter was unremarkable overall and lacked any reference to the left upper extremity. *Id.* at 8-9.

- The next medical encounter is from 15 weeks and two days post-vaccination, on Thursday, February 10, 2020, when Petitioner presented to the primary care PA[5] to address left shoulder pain present "since the end of September… immediately following a flu vaccine that was given close to the shoulder joint." Ex. 4 at 8. The pain was "constant and occasionally sharp… worse with trying to raise her arm up

---

[3] *See, e.g.*, Ex. 7 at 7-8 (April 27, 2018, urgent care encounter for assessment of upper respiratory infections); Ex. 8 at 5-7 (July 23, 2018, annual gynecological examination).

[4] During the same encounter, the pharmacy employee administered a hepatitis A vaccination into Petitioner's right deltoid muscle. Ex. 2 at 2.

[5] The same PA saw Petitioner in November 2017 and in February 2020. Ex. 4 at 4-5, 6-7, and 8-9.

5

or trying to lift or grab things… pain does not improve much with ibuprofen. She feels like there is atrophy of the shoulder." *Id.*

- On exam, the PA documented tenderness on palpation of the left upper trapezius and rotator cuff tendons, as well as deltoid atrophy. Ex. 4 at 8. External and internal rotation of the left shoulder elicited pain. *Id.* The PA suspected rotator cuff tendinitis and subacromial bursitis. *Id.* at 9. She prescribed the non-steroidal anti-inflammatory drug ("NSAID") meloxicam; printed materials on exercises for Petitioner to perform at home; and planned imaging and potentially EMG/NCV studies if the pain did not improve. *Id.* That same day, an x-ray of the left shoulder was unremarkable. *Id.* at 10.

- The PA ordered a February 18th MRI of the left shoulder which visualized intact tendons, no abnormal fluid in the subacromial/ subdeltoid bursa, and an intact acromioclavicular joint. Ex. 10 at 11. The MRI did visualize "a 7 mm osteochondral lesion involving the lateral aspect of the greater tuberosity with extensive surrounding marrow edema," which required clinical correlation. *Id.*

- On referral from the primary care practice, on March 9th, Petitioner had an initial consult at Bluegrass Orthopedics. Ex. 9 at 3. Petitioner reported "lateral left shoulder pain since September… since being injected with a flu shot." *Id.*[6] On exam, the left shoulder was painful with movement. *Id.* at 4. Ryan Patrick Donegan, M.D., reviewed the MRI and ordered lab work including a rheumatoid panel to rule out "infection of [or?] any inflammatory process that may be causing this." *Id.* at 5.

- One week later, Dr. Donegan recorded that Petitioner was doing about the same, and that the lab work had been unremarkable. Ex. 9 at 4. He asked a colleague, Owen McGonigle, M.D., for a second opinion. *Id.*

- At the second orthopedics consult on March 18th, Petitioner reported that her left shoulder injury resulted from the September 24th flu vaccination, which was "administered very proximal on her shoulder." Ex. 9 at 9, 11. Petitioner reported that she had pain "immediately after the administration [which…] gradually increase[ed] over the next several hours until she had significant symptoms." *Id.* Petitioner denied numbness or tingling down the arm. *Id.*

    On exam, Dr. McGonigle recorded mild tenderness to palpation over the bicipital groove and positive impingement signs. *Id.* at 12. Dr. McGonigle recorded that the MRI "show[ed] significant inflammation along the greater tuberosity laterally," and that Petitioner's left shoulder pain was "consistent with shoulder injury related to

---

[6] Within the orthopedics records, the active problems and chief complaint sections refer to the *right* upper arm and humerus. Ex. 9 at 3, 7. This is likely incorrect, because the rest of this record, like the rest of the case file, reflects only concerns and treatment pertaining to Petitioner's *left* vaccinated arm.

6

vaccine administration (SIRVA)."[7] *Id.* Dr. McGonigle recorded that the limited available literature supported that this injury can be prolonged, but cortisone injections may help – and therefore, he proceeded to administer a cortisone injection to Petitioner. *Id.* Dr. McGonigle reviewed case reports of arthroscopic debridement sometimes being beneficial, but he did not believe Petitioner to be a candidate at that point. *Id.* Petitioner would follow up in three months. *Id.*

- At the June 17th follow-up with Dr. McGonigle, Petitioner reported that since receiving the cortisone injection and performing home exercises, her symptoms had been "gradually improving." Ex. 13 at 4. She was currently "about 65 – 70 percent better." *Id.* Dr. McGonigle documented improved range of motion and strength, with decreased pain. *Id.*

- At the next and final follow-up appointment on September 18th, Dr. McGonigle reviewed that Petitioner had "not changed much since her last visit." Ex. 14 at 8. She had full range of motion and good strength, but persistent aching pain. *Id.* After a long discussion about the treatment options including further cortisone injections, surgical intervention, and formal physical therapy, Petitioner expressed that she was "managing okay" with home-based therapy. *Id.* Dr. McGonigle recorded that according to the available literature on SIRVA, "some people never did fully recover from this." *Id.* He directed Petitioner to follow up as needed. *Id.*

- Petitioner has not filed any further records, from the orthopedics practice or any other medical providers, that would evidence any further complaints or treatment for the injury alleged.

- In an affidavit dated September 22, 2020, Petitioner recalls that her "diffuse chest pain was radiated into my bilateral shoulders subsided after I began to be able to manage the profound grief and overwhelming stress I was experiencing from having just lost my father" in 2017. Ex. 1 at ¶ 3. She states that these symptoms in 2017 were "entirely different" than her post-vaccination left shoulder pain. *Id.*

- Petitioner recalls that her pain began immediately upon vaccination and increased to the point that she left work early that day. Ex. 1 at ¶ 4.[8] She initially assumed that the pain was "routine, albeit much worse" and would "eventually resolve on its own." *Id.* After trying to manage the pain on her own and relying on family members for assistance with household tasks, after over four months, she finally decided to

---

[7] The available evidence does not demonstrate that Petitioner was aware of SIRVA or the Vaccine Program at this time. The attorney of record began requesting the medical records on her behalf approximately one month later. *See, e.g.*, Ex. 4 at 1; Ex. 6 at 2.

[8] In his supplemental Response Brief, Respondent requests that Petitioner produce her employment record from 2019 to verify that she took leave from her employment due to shoulder pain. Response at n. 2. Respondent also suggests that such evidence would "easily corroborate" her shoulder pain." *Id.* at 7. I do not find such evidence to be material towards resolving entitlement (or for that matter, damages, given that Petitioner is not seeking reimbursement for lost wages).

7

seek medical attention. *Id.* at ¶¶ 4-7. She also states that she did not discuss her left shoulder with her gynecologist because such appointments "typically only discussed female health issues," and because this encounter occurred only two weeks after vaccination, at which point she believed the pain would resolve on its own. *Id.* at ¶ 5.

- One of Petitioner's coworkers also filed an affidavit, dated September 13, 2020. Ex. 10. She recalls that a local pharmacy provided vaccinations at their place of employment on September 24, 2019. *Id.* at ¶ 2. She recalls that afterwards, Petitioner discussed how badly her flu vaccination hurt; how much pain she was experiencing at the site; and that the vaccination was administered unusually high on her arm. *Id.* The coworker also recalls that Petitioner's pain persisted for "days and weeks" until she eventually sought medical attention. *Id.* at ¶ 5.

- Petitioner's mother, in an affidavit dated September 17, 2020, recalls speaking on the phone on the day of vaccination about her "excruciating" pain, and helping her sometime thereafter with household cleaning. Ex. 11.

- In Petitioner's second affidavit dated January 4, 2021, she avers that she cannot locate any further non-medical evidence relevant to onset. Ex. 15 at ¶ 15.

## IV.   First Issue

The first issue to be resolved is whether Petitioner had a "history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine administration." 42 C.F.R. § 100.3(c)(3)(10)(i).

The medical records reflect that prior to vaccination, Petitioner had a several-month history of intermittent pain which was recorded as being primarily in her chest, but also "shifted" to her ribs, throat, and *bilateral* shoulders There is no evidence of accompanying shoulder "dysfunction," however. Within the contemporaneous medical records, Petitioner attributed the pain to acute anxiety following her father's unexpected death. Her medical providers accepted that explanation. The very limited medical records relating to this pre-vaccination health condition suggest that the symptoms resolved in or around December 2017 and did not resume in the 21 months leading up to her vaccination. Petitioner's affidavit merely provides additional support for that conclusion.

In comparison, Petitioner's post-vaccination pain was limited to her left shoulder and upper arm, persistent, and worse with movement. She was documented to have tenderness to palpation and positive impingement signs. The clinical findings coupled with an MRI of the left shoulder led to an assessment of localized inflammation. She was

treated with meloxicam and a cortisone injection. Finally, I note that the same primary care provider treated both complaints and viewed them distinctly – contrary to Respondent's contentions that the two complaints are "similar," Rule 4(c) Report at 5, and that there is "no medical evidence" to distinguish them, Supplemental Response at 6.

Accordingly, and after reviewing the evidence, there is preponderant support for Petitioner's argument that no "nexus" exists between these two isolated medical events - and therefore the prior pain "would not explain" her post-vaccination injury. Petitioner's Motion at 6.

Similarly, Respondent contends that the prior history "suggests" the presence of another "condition or abnormality… (e.g., NCS/ EMG or clinical evidence or radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." Rule 4(c) Report at 6; 42 C.F.R. § 100.3(c)(3)(10)(iv). But there is insufficient evidence of such a condition, let alone one "that would explain" Petitioner's post-vaccination injury. 42 C.F.R. § 100.3(c)(3)(10)(iv). Rather, this set of symptoms is distinguishable.

## V.   Second Issue

The second issue for resolution is whether Petitioner's left shoulder pain began within 48 hours after vaccination, as required for a Table SIRVA. 42 C.F.R. §§ 100.3(a)(XIV)(B); (c)(10)(ii).

There is a medical record from 14 days after vaccination that does not document left shoulder pain – but it pertains to an encounter for an annual gynecological examination. It would not normally be expected that a medical specialist would check for complaints well outside of his or her expertise. An "intervening medical encounter with a specialist (whose practice is generally unrelated to the musculoskeletal system or pain management) is not enough to *disprove* onset". *Dempsey v. Sec'y of Health & Hum. Servs.*, No. 18-0970, 2021 WL 1080563, at *4 (Fed. Cl. Spec. Mstr. Feb. 17, 2021) (emphasis in the original), cited in Petitioner's Reply at 11. In Ms. Couch's case, this particular record reflects a focused exam that does not address the shoulder. Thus, this particular record is not strong proof rebutting Petitioner's onset allegations.

The fact of a 15-week delay before seeking medical treatment is more troubling – but it does not disprove onset *per se*. Petitioner's Reply at 12 (citing, e.g., *O'Leary v. Sec'y of Health & Hum. Servs.*, No. 18-584V, 2021 WL 3046617, at *11 (Fed. Cl. Spec. Mstr. June 24, 2021) and *Smallwood v. Sec'y of Health & Hum. Servs.*, No. 18-291, 2020 WL 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) ("[i]t is often common for a SIRVA petitioner to delay treatment, thinking his/ her injury will resolve on its own.")). Ms. Couch explained that she initially hoped that her symptoms would self-resolve. This behavior is

similar to her waiting "several months" before seeking medical treatment for her chest pain in 2017. Although this delay does weigh against total injury severity (for purposes of calculating damages), it does not prevent a favorable onset determination, absent *additional* evidence (for example, a medical record identifying onset outside the 48-hour period, or a much longer delay, punctuated by repeated treater visits where shoulder pain could more arguably have been addressed).

The medical records consistently reflect a history of left shoulder pain which began immediately upon vaccination, worsened over the subsequent hours, and persisted for months. It has been recognized that information contained within medical records, including "information supplied to… health professionals" is trustworthy, because it is intended to facilitate diagnosis and treatment and it is generally supplied shortly after the events in question. *Cucuras*, 993 F.2d at 1528.[9] And Petitioner has provided *additional* support by way of supporting witness affidavits, particularly from the coworker who recalls her complaints beginning on the same day the vaccinations were administered in their workplace. In the absence of any evidence supporting a *contrary* onset, I find that onset was most likely within 48 hours. 42 C.F.R. § 100.3(c)(10)(iii).

## VI.   Other Table Requirements and Entitlement

In light of the lack of additional objections and my own review of the record, I find that Petitioner has established the other requirements for a Table SIRVA claim. Specifically, the vaccine administration record reflects the site of administration as the left deltoid. Sections 11(c)(1)(A) and (B)(i); Ex. 2 at 3, 4. Petitioner's pain and reduced range of motion were limited to the affected shoulder. C.F.R. § 100.3(c)(3)(10)(iii). She suffered residual effects of the injury for more than six months. Section 11(c)(1)(D)(i); Ex. 14 at 8. She has not pursued a civil action or other compensation. Ex. 1 at ¶ 12; Section 11(c)(1)(E). Thus, she has satisfied all requirements for entitlement under the Vaccine Act.

---

[9] Respondent also suggests that Petitioner must produce "objective findings from a physician documenting the presence of shoulder pain in the days immediately following vaccination." Response at 7. I have previously rejected this argument. *See, e.g.*, *Niemi v Sec'y of Health & Hum. Servs.*, 19-1535, 2021 WL 4146940, at *4 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (reasoning that the Vaccine Act "clearly does *not* require" such evidence).

## VII. Conclusion and Damages Order

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase.**[10]

**Petitioner shall file a status report updating on the parties' progress towards informally resolving damages by no later than <u>Monday, May 23, 2022</u>.**[11]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[10] The parties are reminded that in Vaccine Act cases, damages issues are typically resolved collaboratively. Therefore, the parties should begin actively discussing the appropriate amount of compensation in this case. In many cases, damages can be resolved by Petitioners communicating a demand to Respondent, who may agree to the demand or may make a counter-offer.

The parties shall not **retain a medical expert, life care planner, or other expert without consulting with each other and the Chief Special Master.** If counsel retains an expert without so consulting in advance, reimbursement of those costs may be affected.

[11] Petitioner previously confirmed that the case does not involve a lost wages claim, a worker's compensation claim, or a Medicaid lien. ECF No. 15. On April 5, 2021, she conveyed a demand for pain and suffering and out of pocket expenses. ECF No. 22. The parties briefly engaged in settlement discussions before reaching an impasse in fall 2021. Respondent's attorney of record has since changed.