# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1246V
UNPUBLISHED

| | |
|---|---|
| KARA COUCH,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: August 24, 2022<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu); Shoulder Injury Related to Vaccine Administration (SIRVA). |

*John Robert Howie*, Howie Law, PC, Dallas, TX, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On September 22, 2020, Kara Couch filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine received on September 24, 2019, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Following my ruling on entitlement in Petitioner's favor in June 2022, the parties reached an impasse concerning the appropriate award of damages, and thus have submitted that issue to my final determination. For the following reasons, I find that Petitioner is entitled to a damages award of **$55,088.38 (representing $55,000.00 for actual pain and suffering, plus $88.38 for actual unreimbursed expenses).**

## I.  Relevant Procedural History and Summary of Parties' Positions

On April 7, 2022, I found that Petitioner had established that she had suffered a Table SIRVA. Entitlement Ruling (ECF No. 38).[3] After it was determined that the parties could not resolve damages on their own, I adopted their proposed schedule to brief the issue – with the focus on an appropriate award for actual pain and suffering. Status Report (ECF No. 41); Scheduling Order (Non-PDF).

Petitioner argues that her actual pain and suffering merits an award of $55,000.00. In seeking that amount, she avers that her experience was most similar to that of the petitioner in *Rayborn* and more severe than that of the petitioners in *Mejias* and *Ramos*. Brief (ECF No. 43) at 2, 16-23;[4] *see also* Exs. 16-18. Respondent, by contrast, maintains that the record supports an actual pain and suffering award of no more than $37,500.00. In proposing this figure, Respondent avers that Ms. Couch's experience is most analogous to that of the *Ramos* petitioner, but less severe. Response (ECF No. 44) at 1, 7-8. On August 1, 2022, Petitioner filed a reply maintaining her previously-stated position. Reply (ECF No. 45) and accompanying Damages Exhibits 1-4.[5] The matter is now ripe for adjudication.

## II.  Authority

In a recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby

---

[3] My prior summary of the prior procedural history and the underlying facts, as set forth in the Ruling on Entitlement, are fully incorporated and relied upon herein. This decision includes further discussion of facts that are relevant to the parties' arguments, as well as my ultimate determination, of the appropriate damages award.

[4] *Rayborn v. Sec'y of Health & Hum. Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for actual pain and suffering); *Mejias v. Sec'y of Health & Hum. Servs.*, No. 19-1944V, 2021 WL 5895622 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) ($45,000.00); *Ramos v. Sec'y of Health & Hum. Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00).

[5] The parties stipulate that Petitioner should be awarded $88.38 for actual unreimbursed expenses. Brief at 2; Response at 9.

incorporate my prior discussion in Sections II and III of *Friberg v. Sec'y Health & Hum. Servs.*, No. 19-1727, 2022 WL 3152827, at *1-4 (Fed. Cl. Spec. Mstr. July 6, 2022).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

In her Reply, Petitioner states that the parties' most significant disagreement is: "Was the emergence of the COVID-19 pandemic reasonable and sufficient explanation for Petitioner to perform a self-guided physical therapy course, rather than attending formal physical therapy, assuming one was even available?" Reply at 1-2; *see also* Response at 6-9 and n. 9 (noting the lack of formal PT).

Past cases in the Program have recognized the pandemic as a potentially relevant factor in assessing severity. *See, e.g.*, *Wilson v. Sec'y of Health & Hum. Servs.,* No. 109-0035V, 2021 WL 1530731, at n.12 (Fed. Cl. Spec. Mstr. Mar. 18, 2021) (finding that concerns about the pandemic during 2020 were "reasonable"); *M.W. v. Sec'y of Health & Hum. Servs.,* No. 18-267V, 2021 3618177, at *4 (Fed. Cl. Spec. Mstr. Mar. 17, 2021) (recognizing that as a result of the pandemic, "many individuals did not, or could not, seek medical treatment for many months"); *Coli v. Sec'y of Health & Hum. Servs.,* No. 20-543V, 2022 WL 706882, at *3 (Fed. Cl. Spec. Mstr. Feb. 4, 2022) (in which the petitioner attended in-person PT until March 2020, after which her therapist offered a virtual forum).

However, even where the pandemic is invoked, my analysis is likely to start with the contemporaneous medical records and other case-specific evidence. *See, e.g.*, *Wilson*, 2021 WL 1530731, at n.12 (observing that despite asserted concerns about the pandemic, the petitioner attended one in-person evaluation in the spring of 2020 and did not pursue further treatment by email or telemedicine); *Lavigne v. Sec'y of Health & Hum. Servs.,* No. 19-1298V, 2022 WL 2275853, at *6 (Fed. Cl. Spec. Mstr. May 12, 2022) ("even accounting for COVID, which I credit, there was not an ongoing effort of Petitioner seeking treatment").

---

[6] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

### III. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Ms. Couch was a competent adult, with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of her injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, affidavits, declarations, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and I rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

The record establishes that Ms. Couch's injury was mild overall. At 35 years old, she was in her "usual state of excellent health." Brief at 2, quoting Ex. 1 at ¶ 3.[7] She developed pain in her dominant left shoulder within 48 hours after the September 24, 2019, vaccination.

Petitioner did not immediately seek treatment for her injury. But she has noted that 14 days after vaccination, she attended an annual gynecological examination, during which "it would not normally be expected that a medical specialist would check for complaints well outside of his or her expertise." Entitlement Ruling at 9. I also accept Petitioner's explanation that she did not alert her gynecologist to what she believed was "routine, albeit worse, post-vaccination pain which would eventually resolve on its own." Ex. 1 at ¶ 5. However, that prevents acceptance of Petitioner's characterization that the pain was already "excruciating." *Id.* at ¶ 4. Rather, the record establishes that Petitioner's pain was persistent but comparatively mild, becoming moderately "sharp" and "wors[e]" when she tried to raise her arm or lift of grab things. This conclusion is supported by her initial attempt to self-manage with ibuprofen, coupled with the expectation that the pain would resolve for over four months, before presenting to her primary care practice on September 10, 2020. The delay in seeking treatment "weighs against total injury severity." Entitlement Ruling at 10.

---

[7] Respondent maintains that Petitioner had a "history of left shoulder pain and dysfunction." Rule 4(c) Report at 2; *see also* Response at 2. In previously reviewing the evidence on this point, I found no evidence of such "dysfunction." Ruling on Entitlement at 8. I recognized that Petitioner had a "several month history of intermittent pain that was recorded as being primarily in her chest, but also 'shifted' to her ribs, throat, and bilateral shoulder," which she attributed to anxiety. *Id.* The medical records "suggest[ed] that the symptoms resolved in or around December 2017 and did not resume in the 21 months leading up to her vaccination." *Id.* I concluded that this earlier history did not establish another condition or abnormality, it and did not explain Petitioner's post-vaccination injury. *Id.* at 8-9. I moreover find that this limited prior history does not bear on the damages determination.

4

At that first primary care encounter, the PA documented tenderness on palpation, and painful external and internal rotation, but no specific measures of range of motion. The PA suspected rotator cuff tendonitis and subacromial bursitis. Petitioner was prescribed a limited course of meloxicam (7.5 mg once per day, for 14 days) and given home exercises. Ex. 4 at 8-9.

After the initial delay in treatment, Petitioner complied with her treaters' recommendations including undergoing an x-ray of the left shoulder, which was unremarkable. *Id.* at 10. The February 18, 2020, MRI of the left shoulder visualized "a 7 mm osteochondral lesion involving the lateral aspect of the greater tuberosity with extensive surrounding marrow edema." *Id.*, with "significant inflammation" according to an orthopedist's later interpretation. Ex. 9 at 11.

In March 2020, Petitioner promptly undertook referrals to one orthopedist, Dr. Donegan, and then to his colleague Dr. McGonigle approximately one week later. Ex. 9 at 3-13. The orthopedic records repeatedly state that Petitioner had "constant" pain rated at 7/10. Ex. 9 at 3; *id.* at 10; Ex. 13 at 3; Ex. 14 at 3. But in contrast on her March 18, 2020, new patient questionnaire, Petitioner wrote that the pain was currently 1 – 2/10 and "at times" rose to 8/10. *Id.* at 9. Of note at this point, Petitioner's prescription for meloxicam had run out. Ex. 4 at 9 (providing a 14-day prescription without refills). Thus, at this point, Petitioner's symptoms were moderate at best.

At the March 18, 2020, initial evaluation, the orthopedist Dr. McGonigle documented that Petitioner's left shoulder was "mild[ly]" tender on palpation. Ex. 9 at 11. Active range of motion on abduction was 160 degrees, forward flexion was 170 degrees, external rotation was 40 degrees, and internal rotation was to T12. *Id.* at 12. Passive range of motion and stability were not limited. Strength was 5/5 on internal rotation, but -5/5 on external rotation and forward flexion ("appear[ing] to be limited by pain; there is discomfort and pain with impingement sign"). *Id.* There was also pain and weakness on a Speed's test. *Id.*

Dr. McGonigle summarized that Petitioner currently had "relatively good motion and strength," but that the findings were consistent with SIRVA, which could be prolonged. Ex. 9 at 12. He did not believe Petitioner to be a candidate for arthroscopic debridement "at this point, but [she] could be considered in the future if symptoms persist." *Id.* Dr. McGonigle recorded that Petitioner would "do some self-guided physical therapy exercises." *Id.* In addition, we will proceed with cortisone injection today… Plan will be to follow up in 3 months." *Id.*; *see also* Ex. 17 (home exercise worksheets). I accept Petitioner's recollection that she "strictly adhered" to the home exercises, performing them approximately two to three days per week. Ex. 16 at ¶ 5.

5

I also accept Petitioner's explanation that she and Dr. McGonigle did not pursue formal PT, at least initially, due to the emerging COVID-19 pandemic. Ex. 16 at ¶ 5 (citing concerns for herself, her husband, and their two small children); *see also* Ex. 18 and Damages Exs. 1-4 (evidencing restrictions on non-essential services in her state of Kentucky and the United States more generally). I find that decision to be reasonable under the circumstances – but also that Petitioner was not left without recourse, since she had alternative measures (namely, a steroid injection and a specific home exercise program) available to her.

At the June 17, 2020, orthopedics follow-up, Petitioner reported that her left shoulder symptoms had been "gradually improving" and that she was currently "about 65-70 percent better." Ex. 13 at 4. She had been "much more active with the shoulder" but "still [had] some symptoms with reaching away from the body or overhead with any weight." *Id.* Upon examination, the left shoulder's active abduction had improved to 170 degrees, forward flexion to 180 degrees, and internal rotation to T12. *Id.* at 5. On forward flexion and external rotation, strength was restored to 5/5, now with "no significant pain." *Id.* An impingement sign did "reproduce some mild symptoms." *Id.* There was no longer "significant pain and weakness with Speed's test." *Id.* Dr. McGonigle summarized that her range of motion, strength, and pain level had improved and would likely continue to prove over time. *Id.* He did not identify any new specific treatment and recorded: "She will continue with home-based physical therapy. If she wishes to trial an outpatient-based program, she can always call for prescription." *Id.* Dr. McGonigle did not see any current "indicat[ion]" for surgery but was willing to reconsider "if symptoms worsen." *Id.*

At the final orthopedics follow-up appointment on September 18, 2020, Petitioner reported her left shoulder had "not changed much since her last visit." Ex. 14 at 8. The physical exam findings were unchanged – and largely normal, as noted above. *Id.* Dr. McGonigle summarized: "She does have full range of motion and good strength in the shoulder however, she has persistent aching pain that limits her daily quality of life." *Id.* Petitioner "felt that she is managing okay and does not wish to consider surgery at this point. She also does not feel that the symptoms warrant a repeat cortisone injection." *Id.* Dr. McGonigle also repeated from the last appointment: "She will continue with home-based physical therapy. If she wishes to trial an outpatient-based program, she can always call for prescription." *Id.* However, there are no further medical records. In her affidavit, Petitioner recalls adhering to the home exercise program "all the way through" to September 18, 2020 – allowing for a conclusion that she *did not* continue the exercises beyond that date. Ex. 16 at ¶ 5. The record reflects a limited treatment course and a general recovery from her injury within one year of vaccination.

I have also reviewed Petitioner's assertion that she has not pursued further treatment, such as further steroid injections and/or surgical interventions, based on her orthopedist's advice. Ex. 16 at ¶ 7. However, the medical records do not support such a conclusion. Instead, they establish that Petitioner herself felt that she was "managing okay" and opted against any further treatment – including continued home exercises or for that matter, formal PT as offered by her orthopedist in June and again in September 2020.

Both parties are commended for identifying relevant past reasoned decisions awarding damages that are comparable to the present case. While cited by both parties, I agree with Petitioner that *Mejias* presents an inapposite fact pattern supporting an "initially high severity of pain" followed by a significant gap in treatment without sufficient explanation, supporting a finding of lower severity over time. In contrast, Ms. Couch's injury worsened over the first four months, before treatment with a cortisone injection and a structured home exercise program (in lieu of formal PT as reasonably explained by the emerging pandemic) followed by improvement within the first year.

Like this case, *Ramos* involved an initial treatment delay of approximately four months. While Respondent contends that this petitioner's emergency department encounter indicates a more severe injury, Petitioner correctly notes that the *Ramos* petitioner left the ER quickly, without undergoing an evaluation or receiving treatment. Moreover, *Ramos* did not put much weight on the emergency encounter – noting that the claimed flare of pain "appears to have been short-lived." 2021 WL 688576, at *5. The *Ramos* petitioner attended only four formal occupational/physical therapy sessions, then self-managed with over-the counter pain medications for an additional five months before returning for mild pain of 2/10. I also emphasized that the "entirely conservative" treatment course in that case did not include any cortisone injections or imaging, unlike in Ms. Couch's case. *Id.*

Petitioner's case is more comparable to *Rayborn*, which involved an initial treatment delay of approximately four months, followed by primary care and orthopedics consultations, one steroid injection, an MRI, and substantial recovery within the first year after vaccination. While the *Rayborn* petitioner also attended 14 occupational therapy sessions over the course of seven weeks, I find that Ms. Couch's pandemic-induced alternative of home exercise, performed two to three times per week for months, is sufficiently equivalent. Respondent's other "key difference" between the cases is that the *Rayborn* petitioner was documented to have more limited range of motion, weakness,

7

and loss of grip strength. Response at 8. But in another case, *Welch*,[8] I awarded $55,000.00 to a petitioner repeatedly documented to have pain, but normal range of motion, throughout her course of treatment. Based on similarities to the petitioners in both *Rayborn* and *Welch*, I find that Ms. Couch is entitled to $55,000.00 for her actual pain and suffering.

## IV.     Conclusion

Based on the record as a whole and the parties' arguments, I award Petitioner a lump sum payment of **$55,088.38 (representing $55,000.00 for actual pain and suffering, plus $88.38 for actual unreimbursed expenses).**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[8] *Welch v. Sec'y of Health & Hum. Servs.*, No. 18-660V, 2021 WL 4612654 (Fed. Cl. Spec. Mstr. Sept. 2, 2021) (awarding $55,000.00 for actual pain and suffering).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.